2023 IL App (1st) 200857

FIRST DISTRICT
THIRD DIVISION
March 22, 2023

No. 1-20-0857

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 8905(03) |
| | ) | |
| JOSE VIDAURRI, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Jose Vidaurri appeals the trial court's denial of his motion for leave to file his *pro se* successive postconviction petition. Specifically, he contends that (1) newly discovered evidence corroborates his claim that his confession was physically coerced by a Chicago police detective, (2) his trial counsel was ineffective for failing to call a supporting witness at his suppression hearing and at trial, and (3) his 45-year *de facto* life sentence is unconstitutional under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was 19 years old when the offenses were committed.

¶ 2    Following his July 2002 jury trial, defendant was convicted of the first degree murder of Dauntrez Snowden and the attempted first degree murder of Nicholas Mobley. The trial court subsequently sentenced defendant to 35 years for the murder conviction and 10 years for the attempted murder conviction, to be served consecutively for a total sentence of 45 years. We

outline the evidence presented at defendant's trial as necessary for our disposition of this appeal. A full discussion of the evidence presented at defendant's trial was set forth in *People v. Vidaurri*, 347 Ill. App. 3d 1110 (2004) (*Vidaurri I*) (table) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 3     David Neira[1] testified at trial that on January 8, 2000, at around 10 p.m., he was driving around with William Solis when they saw their friends in a van. There were several passengers in the van, including defendant, Juan Ocon, Alvaro Vera, Benjamin Pienero, and Francisco Rodriguez. The van belonged to Rodriguez. Neira and Solis parked Solis's car and joined the group in the van. Everyone in the van was a member of the Satan Disciples gang except Ocon, who was a Latin Jiver. Defendant was driving, and Ocon was in the passenger seat. Rodriguez and Pienero were in the middle row captain's chairs while Solis, Vera, and Neira were seated on the back bench. Neira had known defendant since grammar school, about six or seven years. There was some drinking occurring in the van, and Neira had previously smoked some marijuana.

¶ 4     Shortly after midnight on January 9, 2000, the van was driving near Erie Street and Wood Street in Chicago. Neira saw a car the van was following. The van pulled up next to the car, and he saw defendant and Ocon "represent" gang signs to the occupants in the car. The car then "took off" south on Ashland Avenue with the van chasing it. Neira was unable to see the occupants in the car. Ocon was encouraging defendant to chase the car, telling him to "go get

---

[1]We note that the parties spell David Neira's last name as both "Neira" and "Niera." In his testimony, Neira spelled his last name on the record as "N-E-I-R-A," and we will write it as spelled by him.

'em." Both vehicles drove quickly and ran red lights until the car turned onto Jackson Boulevard with the van following. The van bumped into the car and pulled up along the driver's side of the car. Neira saw Ocon with a gun pointing out of the passenger window, and then Vera opened the van door. Ocon and Vera then started shooting at the car. Defendant did not fire a gun, and Neira never saw a gun in defendant's hands, nor did he see defendant give a gun to Ocon. The occupants of the car did not throw anything at the van, and Neira did not see the occupants with any weapons. After the shooting, defendant drove for a couple blocks, parked the van, and everyone went their own way. Neira left with Solis, and they returned to Solis's car. The next day, Neira told Onyx Santana about the shooting. On January 13, 2000, Neira went to the Area 4 police station and spoke with the police. He gave a statement and later testified before the grand jury.

¶ 5    The surviving occupants of the car, Nicholas Mobley, Delbert Guy, and William Peppers also testified about the shooting. On the evening of January 8, 2000, Dauntrez Snowden went out with his friends Mobley, Peppers, and Guy. The men were in a maroon compact car with Snowden driving, Peppers in the passenger seat, Mobley in the back seat on the driver's side, and Guy in the back seat behind the passenger. The men had gone out to celebrate Peppers's departure for college the next day.

¶ 6    At around 12:15 a.m. on January 9, 2000, the men in the car saw the van. The van pulled up next to them on the driver's side, and one of the men in the van flashed gang signs at them. Mobley was not a member of a gang, and as far as he knew, none of the other men in the car were ever gang members. Mobley told Snowden to drive away because he feared they would be robbed. Snowden sped eastbound and turned right to head southbound on Ashland Avenue. The van followed after the men. Mobley told Snowden there was a police station at South Racine

3

Avenue and West Monroe Street, but Snowden was driving too fast to turn onto Monroe Street. Instead, they turned left onto West Jackson Boulevard. Snowden told Peppers to use a cell phone to call the police. Snowden slowed the car to look for the cell phone. At that time, the van caught up to their car. The van pulled alongside the car, and people in the van started firing gunshots at the car. Mobley was unable to see the faces of the persons firing the guns.

¶ 7　　Mobley stated that he was shot in his left leg and right foot. Snowden was also shot and began to lose control of the car. Once the car stopped, Snowden fell out of the car and called for his mother. Chicago police officers saw the victim's car roll through a red light and come to a stop. The officers called paramedics to the scene. Mobley and Snowden were transported to Cook County Hospital for treatment. Mobley was treated and recovered, but Snowden suffered a gun shot to his abdomen and died at the hospital.

¶ 8　　Detective John Climack of Area 4 violent crimes unit was assigned to investigate Snowden's death. On January 10, 2000, Mobley and Guy came to the police station to create a composite of the van and the individual standing on the running board of the van. The composites were distributed to tactical officers. That evening an officer saw a van matching the description and curbed the vehicle. It was transported to Area 4 and was later identified by Mobley and Guy as the van involved in the shooting and, as indicated above, was owned by Rodriguez.

¶ 9　　Detective Climack interviewed several of the individuals involved in the shooting, including Neira, Ocon, Vera, and Rodriguez, as well as Santana. Mobley and Guy viewed a lineup and tentatively identified Santana as a person who stood on the running boards of the van during the shooting. Defendant was not in the lineup. Based on information from those

4

interviews, Detective Climack notified officers to search for defendant. Defendant was arrested at his girlfriend's home on January 13, 2000.

¶ 10    Detective Adrian Garcia assisted Detective Climack and his partner in the investigation. He assisted with either interviewing witnesses or returning to the location of the shooting and trying to locate witnesses. Detective Garcia and his partner Detective Patrick Fanuken met with defendant in an interview room at Area 4. Defendant was advised of his *Miranda* rights and agreed to speak with them. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Initially, defendant denied any knowledge of the shooting and gave an alibi. Detective Garcia then followed up on defendant's alibi.

¶ 11    On January 14, 2000, Detective Garcia told defendant that several witnesses placed him in the van on the night of the murder. Defendant then detailed his involvement in an interview with Detective Garcia. Following the interview, defendant agreed to give a statement. Assistant State's Attorney (ASA) John Blakey came and spoke with defendant. Defendant consented to a videotaped statement discussing his involvement in the murder of Snowden.

¶ 12    In the videotaped statement, defendant stated that on the night of January 8, 2000, he was originally with his girlfriend when he saw Rodriguez's van. Defendant then left his girlfriend's car and got into the driver's seat of the van. When he entered the van, defendant had a loaded 9-millimeter handgun on him. He handed the gun to Ocon, who was seated in the front passenger seat. Defendant stated that another passenger, Vera, also had a gun.

¶ 13    While driving around, he saw a little red car and figured it might be rival gang members. He followed the car southbound on Wood Street, then east on Ashland Avenue, and south to Ohio Street to find out who the men in the car were. When defendant pulled up next to the car, Ocon opened his door and flashed gang signs at the occupants. Ocon told him that one of the

5

people in the car had a hat turned to the right, which signified a gang member. Defendant was a member of the Satan Disciples, while Ocon was a Latin Jiver. The other men in the van were also Satan Disciples. When the men in the red car did not return with their own gang signs, defendant considered it a sign of disrespect, and he chased them in the van. He drove quickly south on Ashland Avenue, running red lights, until he turned left onto Jackson Boulevard. He pulled up close on the left side of the car and hit the car. Defendant then heard the sliding door of the van open and then several gunshots. Ocon had fired multiple shots from the passenger seat. Defendant also heard multiple shots fired from behind him in the van. After the shooting, he drove to a parking lot and exited the van. He left the gun in the van. He felt scared and paranoid.

¶ 14    Continuing in his statement, defendant related that the next day Vera told defendant that Vera and several of the men in the van had been taken to the police station for a homicide. Vera told defendant to leave the state. At the end of his statement, defendant admitted that he had not made any requests for a lawyer and he was treated well by the police and the ASA. He was also given food and cigarettes. He said there were no threats or promises made to provide the statement and that he was giving the statement freely and voluntarily.

¶ 15    During Detective Climack's testimony, the State admitted a 9-millimeter gun. The detective testified that during his investigation, he was directed to an address and recovered the gun. No objection was made at that time, but defendant's counsel objected the following day that the gun was never identified as the gun defendant gave to Ocon. The trial court overruled the objection.

¶ 16    After the State rested, the defense did not present any evidence. Following deliberations, the jury found defendant guilty of the first degree murder of Snowden and the attempted first degree murder of Mobley.

6

¶ 17    On direct appeal, defendant argued that the trial court should have questioned the venire *sua sponte* on their feelings about gang affiliation and that his trial counsel was ineffective for failing to question the venire on a gang bias. This court affirmed defendant's convictions, finding that the trial court had no *sua sponte* duty to question the venire regarding gang bias nor was trial counsel ineffective for failing to question the venire about gang bias. See *Vidaurri I*, 347 Ill. App. 3d 1110.

¶ 18    In March 2005, defendant filed his first *pro se* postconviction petition raising several claims of ineffective assistance of trial and appellate counsel, including trial counsel's failure to file a motion to suppress challenging the voluntariness of defendant's confession. In his affidavit, defendant asserted that he was physically abused by Detective Garcia. He further alleged that counsel was ineffective for failing to interview and present several witnesses in his defense, including Santana, Officer Michelle Rubino, and himself. Defendant also argued that newly discovered evidence regarding the brain development of young adults would have yielded different results at sentencing. The trial court summarily dismissed the petition. This court affirmed the dismissal of defendant's petition. *People v. Vidaurri*, 368 Ill. App. 3d 1222 (2006) (*Vidaurri II*) (table) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 19    In July 2019, defendant, through counsel, filed a motion for leave to file a successive postconviction petition. In his successive petition, defendant alleged that (1) he was actually innocent of the murder based on newly discovered evidence, (2) his trial counsel was ineffective for failing to present the testimony of Santana in support of a motion to suppress and at trial, (3) newly discovered evidence of Detective Garcia's pattern and practice of coercing confessions supports defendant's claim that his statement was taken in violation of his rights under the fourth and fifth amendments (U.S. Const., amends. IV, V), (4) appellate counsel was ineffective for

7

failing to argue on direct appeal that defendant was arrested without a warrant in violation of the fourth amendment, and (5) his *de facto* life sentence violates the eighth amendment of the United States Constitution and proportionate penalties clause of the Illinois Constitution (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, § 11).

¶ 20     In support of his petition, defendant attached several exhibits, including affidavits from Santana, Vera, and himself. Vera's affidavit was dated in 2005 and was previously attached to defendant's initial postconviction petition. In his affidavit, Vera stated that he was present in the van on the night of the shooting. He did not see defendant with a gun the night of the shooting, nor did he see defendant give a gun to anyone. He also did not see defendant represent gang signs to anyone. Defendant objected immediately after the shooting, drove to a parking lot, refused to drive any further, and left the van.

¶ 21     In his affidavit, Santana stated that he was arrested in connection with this case after he had been identified in a lineup. He was handcuffed to a wall in the police station and the detectives would turn the lights off for hours, but if he fell asleep, someone would enter the room and choke, smack, or spit on Santana. He stated that he was starved for three days and that officers brought a hamburger into the room but would not allow him to eat it and later threw it in the trash. Later, officers told Santana that he was not involved but told him to sign a statement, even though the statement was not true.

¶ 22     Defendant's affidavit, dated in 2005, was previously attached to his initial postconviction petition. In his affidavit, defendant stated that after he was arrested, he was placed in an interrogation room at the Area 4 police station. He was handcuffed to a ring in the wall. Detective Garcia entered the room alone, asked defendant if he knew why he was there, and said he had been implicated in a shooting. According to defendant, the detective never informed him

of his *Miranda* rights and defendant's request for an attorney and a phone call were ignored. In the room, there were three chairs lined up against the wall where he was handcuffed. He laid down across the chairs to sleep. While he was sleeping, three or four detectives entered the room and "yanked" him off of the chairs. As he went to look up, his head was pushed down. When he tried to raise his head again, he was smacked in the back of the head several times and told to keep his head down. Once the detectives left the room, defendant noticed the chairs had been removed. He tried to stand as long as he could, but he sat when he became too tired. He felt "extreme discomfort and pain" when he sat because his body weight was pulling on his handcuffed wrist. He stated that every time he fell asleep that night, someone "yanked and smacked" him awake.

¶ 23    The next day, he was woken up by Detective Garcia and another detective. Defendant never learned the name of the second detective. They brought in two chairs. Detective Garcia told defendant that he knew defendant had been the driver in a shooting but was not the shooter. Defendant told him that he had nothing to say and wanted a lawyer. Detective Garcia then "smacked" defendant repeatedly and said defendant did not need a lawyer. He also struck defendant in the face and told defendant to stop lying. Defendant continued to state that he did not want to talk to the detectives. Detective Garcia then threatened defendant that if defendant did not tell him what he wanted, then he would arrest defendant's cousin and take her child away. Defendant then "gave in to the pressure" and told Detective Garcia some details of the shooting. Detective Garcia was not happy with defendant's answers and asked defendant about details of the shooting. Defendant stated that some of the questions from the detective were about details defendant did not remember, or details that were not true, such as Ocon being present and

being the shooter. Detective Garcia asked defendant if he was hungry or needed anything; defendant told him he was hungry and asked for a cigarette. The detective uncuffed defendant.

¶ 24     In his affidavit, defendant also averred that Detective Garcia later returned to the room with ASA Blakey. ASA Blakey told defendant that it was not his decision whether defendant would be charged, but ASA Blakey "had a way to show the judge" that defendant helped. Detective Garcia and ASA Blakey told defendant that giving a videotaped statement was a good idea, and ASA Blakey explained what would happen on the video. Defendant stated that they practiced his statements over and over until the detective and the ASA were satisfied. They coached defendant how to answer the questions. He said several things that were not true, including (1) Ocon was in the van when defendant entered, and Ocon flashed gang signs and shot at the car; (2) defendant gave a loaded handgun to Ocon; (3) defendant saw the car and knew they were rival gang members based on the way their hats were turned; (4) he knew Ocon would fire at the car if they were rival gang members; and (5) he saw Vera on the street the next day, and Vera told him to leave town because police were "picking people up on a homicide." At some point, defendant remarked to Detective Garcia that defendant probably "won't be out for 30 years," and the detective replied that defendant would "only do about 10 years, if that."

¶ 25     Defendant further stated that he told his trial counsel about his treatment while at the police station, including how he was coerced and coached by Detective Garcia and ASA Blakey into making a videotaped statement. His counsel told him that she would not be challenging his statement because the trial judge would deny the motion, and then the State would know their "game plan for trial."

¶ 26     Defendant also attached exhibits from other individuals in unrelated cases in support of his claims of abuse and coercion by Detective Garcia. In an affidavit, Raul Fernandez stated that

10

in October 2005, he was placed in a room at the Area 4 police station and handcuffed to a metal bar. While there, detectives would enter the room and tell him to stop lying and slap him on the face and punch his ribs and stomach. Fernandez identified the main detective harming him as "Garcia."

¶ 27    A letter to defendant's postconviction counsel from Isaiah McDonald stated that he was including a copy of his complaint against Detective Garcia and another detective. McDonald stated in March 2004, he was brought to the Area 4 police station and was "violated both physically and constitutionally" by the detectives. A computer printout detailed a report against Detective Garcia, but the reporting party's name was redacted. The allegations stated that when he did not provide satisfactory answers, Detective Garcia punched his ribs, pressed his shoulder into the victim's torso, and choked the victim if the victim failed to respond. Defendant also attached a complaint filed by Josefina Rodriguez against the City of Chicago and three members of the Chicago Police Department, including Detective Garcia. The complaint alleged that Detective Garcia and two other named detectives detained Rodriguez for questioning as a witness in a homicide investigation over the course of two days and three nights. She stated that her requests for food and to leave were ignored. The transcript of Rodriguez's testimony in court proceeding was also included in the exhibits.

¶ 28    Defendant also attached a printout from the Citizen's Police Data Project (CPDP) website, which listed 15 allegations, including 4 allegations for use of force, against Detective Garcia between 1987 and 2019, as well as one report for use of force from 2015. The report indicated that zero allegations had been sustained. No details for the use of force allegations or report were included in the printout. Documents indicating a settlement agreement between Jose

Lopez and the City of Chicago for a case in which Detective Garcia was one of five named police offers was also attached to defendant's petition.

¶ 29    In July 2020, the trial court denied defendant leave to file his successive postconviction petition in a written order. The court held that Vera's affidavit did not satisfy the standards for actual innocence. Specifically, the court concluded that Vera's affidavit did not aver that defendant did not have a gun on the night of the shooting, but only that he did not see defendant with a gun or pass a gun to Ocon. Further, Vera's claim that no one in the van said anything about committing an act of violence was belied by the fact that Snowden's car was followed in a manner seeking to threaten the occupants of that car. The court also found that defendant's claims of ineffective assistance of trial counsel failed to satisfy the cause and prejudice test. The court observed that defendant previously argued in his initial postconviction that his trial counsel was ineffective for failing to file a motion to suppress his statements and was therefore barred by *res judicata*. Additionally, the court did not find Santana's affidavit or defendant's exhibits sufficient to establish a pattern and practice of abuse and coercion by Detective Garcia. Finally, the court found defendant's claim regarding his *de facto* life sentence to be unavailing under both the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 30    This appeal followed.

¶ 31    On appeal, defendant argues (1) newly discovered evidence established that Detective Garcia engaged in a pattern and practice of coercion and physical abuse and corroborates defendant's claim that his confession was coerced, (2) his trial counsel was ineffective for failing to call Santana as a witness at both a hearing on a motion to suppress defendant's statement and trial, and (3) his *de facto* life sentence violates the proportionate penalties clause (Ill. Const.

12

1970, art. I, § 11). Defendant has not challenged the remaining claims presented in his successive petition on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal); see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 32    The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1(a)(1) (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Only one postconviction proceeding is contemplated under the Post-Conviction Act (*People v. Edwards*, 2012 IL 111711, ¶ 22), and a defendant seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). The bar against successive postconviction proceedings should not be relaxed unless (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22-23; *People v. Smith*, 2014 IL 115946, ¶ 30. Under the cause and prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)).

¶ 33    The cause and prejudice standard is higher than the normal first stage "frivolous or patently without merit" standard applied to initial petitions. *Id.* ¶¶ 25-29; *Smith*, 2014 IL 115946, ¶ 35 ("the cause-and-prejudice test for a successive petition involves a higher standard than the

13

first-stage frivolous or patently without merit standard that is set forth in section 122-2.1(a)(2) of the Act"). "A defendant shows cause 'by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *People v. Wrice*, 2012 IL 111860, ¶ 48 (quoting 725 ILCS 5/122-1(f) (West 2010)). In other words, to establish "cause" a defendant must articulate why he could not have discovered the claim earlier through the exercise of due diligence. *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 72. A defendant shows prejudice by demonstrating that the claim so infected the trial that the resulting conviction or sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48. It is defendant's burden to establish a *prima facie* showing of both cause and prejudice in order to be granted leave before further proceedings on his claims can follow. See *People v. Bailey*, 2017 IL 121450, ¶ 24. We review the trial court's denial of leave to file a successive postconviction petition *de novo*. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 34   Defendant first argues his newly discovered evidence established that Detective Garcia engaged in a pattern and practice of coercing statements and supports his claim that defendant's confession was coerced. The State responds that defendant previously raised this claim in his initial postconviction petition and, thus, his claim is barred under the doctrine of *res judicata*.

¶ 35   "A ruling on an initial post-conviction petition has *res judicata* effect with respect to all claims that were raised or could have been raised on the initial petition." *People v. Orange*, 195 Ill. 2d 437, 449 (2001). More broadly, "any issues that have previously been decided by a reviewing court are barred by *res judicata*." *People v. Harris*, 224 Ill. 2d 115, 124-25 (2007).

¶ 36   In his initial postconviction petition, defendant argued that his trial counsel was ineffective for failing to challenge the voluntariness of his confession because he had been coerced by the detectives. Specifically, defendant asserted in that petition that "he was coerced

14

by the police to give the statement through physical abuse and harassment." He alleged that when he told his trial counsel of the police coercion, she responded that she would not be challenging the video confession because the trial judge would deny the motion and the State would know the trial strategy. This court considered and rejected defendant's claim as follows. *Vidaurri II*, slip order at 12-13.

> "Here, petitioner cannot show that his trial counsel's decision to file a motion to quash arrest and suppress evidence rather than a motion to suppress evidence was not trial strategy. His trial counsel sought to challenge petitioner's arrest at his girlfriend's house by arguing that petitioner lived at the house. Trial counsel aimed to have the arrest quashed and all subsequent evidence, including the videotaped statement, suppressed. Petitioner contends that his trial attorney should have sought to suppress the videotaped statement based on his allegations of coercion against the police department. However, the videotaped statement refutes petitioner's claims of coercion and the involuntary nature of the statement. During the videotaped interview, petitioner sits at a table with his hands crossed and calmly answers questions. He does not hesitate or give any indication that he was speaking against his will. ASA Blakey read petitioner his *Miranda* rights and asked petitioner if he has voluntarily agreed to give the statement. Significantly, at the conclusion of the statement, petitioner asked to make an additional statement on his own and stated that he wanted the judge to know that he was willing to cooperate with the investigation.
>
> We find that petitioner cannot show that his trial counsel's failure to file a motion to suppress his videotaped statement constituted ineffective assistance of

counsel. His attorney chose as a matter of trial strategy to attack petitioner's arrest. Additionally, the videotaped statement does not support petitioner's allegations of coercion and in fact, it shows petitioner to be cooperative, calm and forthcoming with his answers. Petitioner cannot show that the trial court would have granted a motion to suppress his videotaped statement. For these reasons, petitioner's claim of ineffective assistance must fail." *Id.*

¶ 37 Defendant attempts to avoid the bar of *res judicata* by asserting that his newly discovered evidence established that Detective Garcia engaged in a pattern and practice of physically coercing statements. The doctrine of *res judicata* may be relaxed where fundamental fairness so requires, "where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record." *People v. English*, 2013 IL 112890, ¶ 22. We will review defendant's supporting evidence to determine if the bar of *res judicata* should be relaxed.

¶ 38 Defendant contends that his newly discovered evidence of a pattern and practice of coercion by Detective Garcia satisfies the required cause and prejudice test. We first consider the cause prong. According to defendant, he established the requisite cause because he could not have included these supporting documents earlier because the conduct either occurred after his previous postconviction petition or he was unaware of the evidence. In response, the State asserts that even if the supporting documents were newly discovered, defendant cannot show prejudice because none of the attached documents support his claim of abuse.

¶ 39 Recently, the Illinois Supreme Court observed with approval that multiple appellate decisions found newly discovered evidence of police coercion may, depending on the individual circumstances of the case, provide cause for permitting the filing of a successive postconviction

petition. *People v. Blalock*, 2022 IL 126682, ¶ 42. The *Blalock* court specifically discussed the appellate court's reasoning in *People v. Brandon*, 2021 IL App (1st) 172411.

> " 'It is through no fault of his own that a defendant does not have immediate access to evidence of a broader pattern of similar abuse inflicted on others by the accused officers. This evidence pertains to the conduct of the State's own agents, toward unknown individuals, during the investigation of other, usually unrelated, cases. The agents in question, the accused officers themselves, have every incentive to remain mum, if not to deny everything. And even the most diligent investigation of a defendant's own case will not reveal to him *who else* may have been abused by the same officers when they were interrogated in *their own* cases.
>
> Uncovering that information is, of course, usually a herculean task for the defense. But the more important point is that this information generally has nothing to do with the facts of the defendant's own case. Thus, investigating the defendant's own case, as diligent counsel is required to do, will not uncover this information. [Citations.]
>
> In other words, the evidence a defendant needs to corroborate a claim of police abuse is as "external to the defense" as it could possibly be, and the barriers to obtaining it are entirely "objective"—that is, not of the defense's own making. [Citations.] So the defendant cannot be faulted for lacking this evidence at the start, and if it becomes available to him later, he may use it then in a successive petition. There is cause for his "failure" (so to speak) to find and use this pattern-and-practice evidence earlier.' " (Emphases in original.) *Blalock*, 2022 IL 126682,

¶ 44 (quoting *Brandon*, 2021 IL App (1st) 172411, ¶¶ 57-59).

¶ 40     Following this discussion, the supreme court in *Blalock* found that the defendant had satisfied the cause requirement. *Id.* ¶¶ 45-47. The circumstances in this case support a similar finding. Defendant's supporting documents were not available for various reasons to defendant at the time of his initial postconviction in 2005, nor does the State challenge defendant's argument. Thus, we find defendant has established cause.

¶ 41     Since defendant must establish both prongs, we now review whether defendant can establish the requisite prejudice. Leave to file a successive petition requires a showing of prejudice, meaning the alleged constitutional error, *i.e.*, the use of defendant's physically coerced confession, "so infected his trial that the resulting conviction violated due process." *People v. Jackson*, 2021 IL 124818, ¶ 30; 725 ILCS 5/122-1(f) (West 2018). To establish prejudice based on new evidence, defendant must show that the evidence, taken as true, is " 'conclusive' " in the sense that " 'it will probably change the result upon retrial.' " *Jackson*, 2021 IL 124818, ¶ 31 (quoting *People v. Patterson*, 192 Ill. 2d 93, 139 (2000)). When the new evidence relates to the physical coercion of a confession, our supreme court has made it clear that the use of a defendant's physically coerced confession as substantive evidence of guilt at trial is never harmless error. *Wrice*, 2012 IL 111860, ¶ 71.

¶ 42     In *Patterson*, the supreme court held that a defendant has presented sufficient evidence at the pleading stage to warrant further postconviction proceedings where (1) the defendant consistently claimed he was tortured, (2) his claims of torture were and always had been similar to other claims depicted in the new evidence, (3) the officers identified in the evidence were the same officers in the defendant's case, and (4) the defendant's allegations were consistent with documented findings of torture against the officers. *Patterson*, 192 Ill. 2d at 145.

¶ 43    The supreme court in *Jackson* recently clarified:

> "To be sure, similarity is a critical factor to consider when determining whether new evidence of police misconduct in other cases establishes a pattern and practice of certain behavior. However, the test is not one of exact or perfect identity. Rather, the critical inquiry is simply whether there is sufficient similarity between the misconduct at issue in the present case and the misconduct shown in other cases, such that it may fairly be said the officers were acting in conformity with a pattern and practice of behavior." *Jackson*, 2021 IL 124818, ¶ 34.

Evidence will generally provide stronger corroboration for a defendant's allegations if it documents abuse close in time to his own. A single incident, years removed, will not establish a pattern and practice of police abuse, but " 'a series of incidents spanning several years' " might. *Id.* ¶ 37 (quoting *Patterson*, 192 Ill. 2d at 140). As this court previously observed, the overall strength of the evidence against defendant at trial is irrelevant. *People v. Weathers*, 2015 IL App (1st) 133264, ¶ 38.

¶ 44    With this framework in mind, we consider defendant's newly discovered evidence to determine if the documents support his claim of a pattern and practice of police abuse by Detective Garcia. Defendant attached multiple supporting documents, including affidavits from Santana and Fernandez, as well as a complaint and related testimony from a lawsuit in which Detective Garcia was one of three named police officers, a list of allegations against Detective Garcia from the CPDP website, evidence of a settlement agreement in which Detective Garcia was one of five named officers, and a letter from McDonald with a redacted report alleging coercion against Detective Garcia and another detective.

¶ 45     First, we review the report from the CPDP website and the documentation related to two separate civil lawsuits. The CPDP report for Detective Garcia listed 15 total allegations, including four allegations for use of force, between 1987 and 2019, as well as one report for use of force from 2015. The report indicated that zero allegations had been sustained. Significantly, the report does not disclose any details for any allegations other than a case number, date, and a notation of the resolution. The four use of force allegations were dated August 7, 1988, January 14, 2000, January 14, 2000, and February 23, 2004. We point out that defendant's time in custody at Area 4 was also January 14, 2000. Each allegation had the following notation: "Not Sustained, No Action Taken." The use of force report indicated a case number and the date June 15, 2015, and no additional information. None of the listed allegations were for coercion or intimidation of a witness or suspect. Since these allegations lack any details about the incidents, this report does not support a claim of a pattern and practice of abuse by Detective Garcia. See *Jackson*, 2021 IL 124818, ¶ 35 (finding the attachment of a citizen complaint log lacked relevance where none of the allegations were for coercion or the intimidation of a witness or suspect).

¶ 46     Similarly, the documents related to the civil lawsuit filed by Jose Lopez against the city and five named police officers, including Detective Garcia, fail to provide any details of alleged abuse by the officers. The documents include a 2007 blog published by Andrew M. Hale & Associates, LLC, reporting that Lopez's federal civil rights lawsuit was barred by the statute of limitations. The blog noted Lopez alleged that he was arrested and charged in 2002 and later in 2005, he was "tried on the false charges" and acquitted of murder. Additional documents, dated April 18, 2012, showed the City Counsel Finance Committee's approval of a $750,000 settlement of Lopez's case against the city and the named officers. No details of the allegations

were disclosed. Given the lack of information, these documents cannot support a claim relating to the pattern and practice of Detective Garcia.

¶ 47     We next review documentation from the federal lawsuit by Josefina Rodriguez against the City of Chicago, the superintendent of the Chicago Police Department, and three named detectives, including Detective Garcia. In her complaint, Rodriguez alleged that she was detained for questioning as a witness in a homicide investigation in a "series of locked, windowless interrogation rooms and held incommunicado" from the evening of April 2, 2005, until the morning of April 5, 2005. She was handcuffed and taken to an interrogation room at the Area 4 police station and handcuffed to the wall until the morning of April 3, 2005. She was interrogated by the three detectives during the "two full days and three full nights." She further alleged that the detectives threatened to arrest her and send her to jail. They also ignored her requests for food and repeated requests to leave. The morning of April 5, 2005, Rodriguez was taken to testify before the grand jury and was not permitted to leave until she concluded her testimony.

¶ 48     Defendant also attached transcripts purportedly from a federal civil lawsuit filed by Ramon Ayala against the City of Chicago, but the transcript pages do not disclose a case number or caption. In the transcripts, Rodriguez testified about the events beginning on April 2, 2005, when she was notified of a shooting near where her boyfriend, Rafael Guerrero, lived. When she arrived at the scene, she saw Guerrero being questioned by police. While there, Rodriguez was handcuffed, placed in a squad car, and taken to the police station. She then recounted her detention at the police station as a potential witness. She stated that she was held at the station for over 60 hours and her requests for food, to use the restroom, and to leave were denied. She was only given food, consisting of two slices of pizza and water, on the night of April 3, 2005,

and some peanuts and a soda on the morning of April 5, 2005. Officers told her that if she did not comply and give a statement, then she would be sent to jail for 60 years and would be unable to see her son. She generally described the three detectives who were involved in her detention: one was "short, dark, looked Arabian, glasses, black hair," but she did not know his name; the second she referred to as "Kenny, Kevin" and he was white, big, and tall, "like a football player"; and the third detective was white, with a "big belly" and "like a pointy nose." She did not name any of the detectives.

¶ 49    After reviewing Rodriguez's claims, we find little similarity between her circumstances and those described by defendant. While both defendant and Rodriguez described being handcuffed to a ring in the wall, their claims differ significantly. Rodriguez testified that she was seated in a chair with one arm handcuffed to the wall, but was left alone in the room overnight, and the handcuff was removed the next day. In contrast, defendant alleged in his affidavit that he was initially laying on three chairs with one hand cuffed to the wall, but detectives entered the room and removed the chairs. He also described being "yanked and smacked awake" if he fell asleep. Significantly, defendant alleged that he was repeatedly smacked and slapped by detectives, but Rodriguez never alleged any physical contact by the detectives. Further, defendant did not allege that he was deprived of food, as Rodriguez asserted. Additionally, while Rodriguez's lawsuit named Detective Garcia, she made no specific allegations against him in either her complaint or the attached testimony. All allegations in her complaint were against all three detectives without any differentiation between their respective conduct. We also note that Rodriguez's claims were based on an April 2005 interrogation, five years after defendant's January 2000 interrogation. Given these significant differences as well as the lack of proximity

in time, Rodriguez's complaint and testimony do not support a pattern and practice of coercion by Detective Garcia.

¶ 50    Next, we review the attached affidavits and letter from individuals alleging police misconduct. In his 2013 affidavit, Raul Fernandez stated that on October 24, 2005, he was placed in a room at Area 4 with his arm handcuffed to a metal bar. During his interrogation as part of a murder investigation, the detectives would enter the room and tell Fernandez to stop lying and that he had no rights. The detectives would also slap his face and punch his ribs and stomach. He knew one of the detectives as "Garcia," and he was the main one causing harm to Fernandez. He further stated that the detectives forced his codefendant as well as other witnesses into making false statements against him in the murder case. Additionally, Fernandez stated that around the summer of 2002, "Garcia" brought drugs to some of Fernandez's former gang members to sell for him. Fernandez said that he did not come forward with this information before because he was afraid.

¶ 51    Again, this alleged interrogation coercion occurred more than five years after defendant's interrogation. While Fernandez states that a detective he knew as "Garcia" was involved, he does not identify the detective's first name. Assuming that it is the same detective, Fernandez offered no details about the murder case, such as, whether he was charged, tried, or convicted in the case. He does not state that he confessed based on the alleged coercion and physical abuse by Detective Garcia and the other involved detectives. His allegations consist of a single paragraph and lack similarity with defendant's claims. While Fernandez stated that he was slapped, he further said that the detectives punched him in the ribs and the stomach. Defendant has not alleged that he was punched. According to Fernandez, his arm was handcuffed to a metal bar, but he does not state that chairs were removed and that he was prevented from sleeping. Finally,

23

Fernandez offered the unrelated allegation that Detective Garcia provided drugs to gang members. Since these general allegations of police misconduct do not involve similar methods and occurred more than five years apart, Fernandez's affidavit fails to offer sufficient similarity to support defendant's claims.

¶ 52    We next consider a letter written by Isaiah McDonald and a printout of a report purportedly involving McDonald. McDonald's undated letter was addressed to postconviction counsel and indicated that he was including a copy of his complaint against Detective Garcia and another detective. He wrote that in March 2004, he was brought to the Area 4 police station and while in the custody of these detectives, he was "violated both physically and constitutionally." He was assaulted and denied the right to speak to an attorney. He asserted that he had witnesses who would testify that these detectives coerced them to give statements leading to his indictment for a homicide. His brief description consisted of four sentences with only these general allegations.

¶ 53    The complaint has redacted the name of the reporting party. The incident occurred on March 30, 2004, at the Harrison and Kedzie homicide division and involved two detectives. The allegations stated that the reporting party was placed in a small room without heat or a place to sit and the police asked him about a homicide. When he did not provide satisfactory answers, Detective Garcia "physically abused him" and told him that if he wanted it to stop, all he had to do was give a statement. Additional allegations referred to "the accused officer" and do not specify if the conduct was by Detective Garcia or the second detective. The "accused officer" punched the victim's ribs, pressed his shoulder into the victim's torso, and choked the victim if the victim failed to respond. The allegations further stated that the accused officer forced the victim to participate in several lineups and told him that if he did not provide a statement or said

he was coerced, the process would continue. The victim "stated that he was in fear for his life and that he would have done anything to end the torture." The report indicated that the complaint was assigned to the independent police review authority in March 2017, suggesting that the complaint was made at that time.

¶ 54     McDonald's letter does not offer any details of alleged abuse beyond general references. Assuming that the redacted report involved McDonald, the misconduct alleged against Detective Garcia is not similar to defendant's allegations. While defendant's allegations included being handcuffed, deprived of sleep and chairs, and slapped and smacked, McDonald alleged that a detective punched him in the ribs, pushed his shoulder into McDonald's torso, and choked him. The only similarity was that McDonald also stated that he was not given a place to sit in the interrogation room. Since these allegations lack any similarity to defendant's claims, these documents fail to show a pattern and practice of abuse.

¶ 55     The last supporting document is an affidavit from Santana related to his interrogation in the present case. In his 2018 affidavit, Santana stated that he was arrested in connection with the murder of "William Peppers [*sic*]"[2] after he had been identified in a lineup. He was handcuffed at shoulder height to a wall in the police station. The detectives would turn the lights off for hours, but if he fell asleep, someone would enter the room and choke, smack, or spit on Santana. He stated that he was starved for three days and that officers brought a hamburger into the room but would not allow him to eat it and later threw it in the trash. Later, officers told Santana that

---

[2]We note that Santana misstated the murder victim. Peppers was an occupant in the red car but was not shot. Snowden was killed and Mobley was injured by the gunshots fired by Ocon and Vera.

they knew he was not involved but told him to sign a statement, even though the statement was not true. He signed the statement because he "would have done anything to get out of there."

¶ 56    Santana further stated that he spoke with David Neira the day after the shooting, January 9, 2000. Neira told him that defendant was upset after men in the van shot at the other car and defendant refused to drive the van after the shooting. Since defendant refused to drive, the Satan Disciples had issued a "smash on sight" order for defendant. Santana told the detectives this, but "they did not want to hear it." Santana further stated that he knew an individual called "Bam-Bam" was one of the shooters, but "Bam-Bam" was dangerous and the chief of the Satan Disciples at the time, so he could not implicate him. The police wanted him to implicate Ocon. However, "Bam-Bam" was killed not long after this happened. Santana further stated that when he testified before the grand jury, he told the truth about his abuse by police and how the police told him what to say.

¶ 57    Significantly Santana's affidavit failed to include names for any of the involved detectives. Defendant contends that since Detective Climack testified at trial that he interviewed Santana and Detective Garcia testified that he assisted Detective Climack with witness interviews, we can infer that Detective Garcia was involved in the alleged abuse. However, neither detective testified that Detective Garcia participated in the interview of Santana. Additionally, Santana's handwritten statement indicates that Sergeant Walsh and an ASA were present, and neither Detective Climack nor Detective Garcia were listed. Since nothing in the record or Santana's affidavit confirm that Detective Garcia participated in his interrogation, we decline to make such an assumption.

¶ 58    Further, Santana's allegations of police misconduct differ from defendant's claims. Santana described the detectives turning the lights on and off for hours until he had no concept of

26

time. He also stated that the detectives choked and spit on him and that he was starved for three days. In contrast, defendant's affidavit made no allegations that he was choked, spat on, or starved, or that the lights were turned off and on. Rather, defendant stated more than once that he was offered food by Detective Garcia. He also said that he was given cigarettes by the detectives. Given the dissimilar allegations involving different detectives, Santana's affidavit does not support a pattern and practice by Detective Garcia.

¶ 59    After our review of defendant's supporting documents, we conclude that the newly discovered evidence fails to provide sufficient similarity to defendant's claims. Notably, most of the supporting documents fail to allege claims against Detective Garcia to establish a pattern and practice of abuse sufficient to show prejudice. The documents either failed to provide details of allegations against Detective Garcia or the allegations differed and lack the necessary similarity.

¶ 60    Defendant relies on *Brandon*, 2021 IL App (1st) 172411, for support of his argument. However, based on our analysis, we find *Brandon* distinguishable on its facts. In that case, the defendant had consistently asserted his police statement from 1991 was coerced by the police. In his successive petition, the defendant attached three affidavits and a federal complaint to support his claim of a pattern and practice of abuse by the same two police detectives. Significantly, one of the affidavits and the federal evidence detailed similar physical abuse by the same named detectives occurring a year after the defendant's confession in 1992. *Id.* ¶¶ 34, 75. The additional affidavits also alleged the same detectives engaged in similar physical abuse in 1999 and 2001. *Id.* The *Brandon* court concluded that "the new evidence tends to show that the detectives were acting in conformity with a pattern and practice when they (allegedly) physically coerced defendant's confession." *Id.* ¶ 76. In contrast, defendant's supporting documents either fail to name Detective Garcia as the detective involved in the allegations, fail to offer any details of

Detective Garcia's actions, or lack sufficient similarity to defendant's allegations of abuse. Accordingly, defendant failed to establish the requisite prejudice and the trial court properly denied his motion for leave to file his successive petition.

¶ 61     Defendant next contends that he has established the requisite cause and prejudice for his claim that his trial counsel was ineffective for failing to call Santana as a witness. According to defendant, Santana's testimony at both a suppression hearing and at trial would have corroborated defendant's contention that Detective Garcia coerced his videotaped statement. The State maintains that defendant cannot demonstrate prejudice because his claim of ineffective assistance lacks merit and that defendant previously argued that his trial counsel was ineffective for failing to file a motion to suppress his videotaped statement.

¶ 62     Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment (U.S. Const., amend. VI). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by

counsel has ultimately proved unsuccessful, does not establish a denial of [the effective] assistance of counsel." *Id.*

¶ 63    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 64    As previously discussed, defendant argued in his initial postconviction petition that his trial counsel was ineffective for failing to challenge the voluntariness of his confession because he had been coerced by the detectives. In that petition, he alleged that "he was coerced by the police to give the statement through physical abuse and harassment." When he told his trial counsel of the police coercion, she responded that she would not be challenging the video confession because the trial judge would deny the motion and the State would know the trial strategy. This court considered and rejected defendant's claim. *Vidaurri II*, slip order at 12-13.

¶ 65    In addition to his prior appeal before this court, defendant also raised this ineffective claim in a federal *habeas corpus* petition. See *United States ex rel. Vidaurri v. Hardy*, No. 08 C 3665, 2012 WL 1068735, at *15 (N.D. Ill. Mar. 29, 2012). There, defendant again contended that his trial counsel was ineffective for failing to file a motion to suppress his statement. The district court also rejected defendant's claim.

> "Indeed, a motion to suppress Petitioner's statement on the basis that it
> was the result of police coercion appears to have had no chance of success. As the

appellate court observed, the video of the statement shows Petitioner sitting calmly at a table, assenting to the waiver of his *Miranda* rights, and calmly answering questions. [Citation.] Of particular import, at the conclusion of the statement and without any prompting from police, Petitioner volunteered the statement that 'he wanted the judge to know that he was willing to cooperate with the investigation.' [Citation.] Given the complete dearth of evidence of coercion and Petitioner's apparent strategic desire to cooperate, the appellate court concluded that trial counsel's decision not to move to suppress the statement on that basis cannot be said to fall below an objective standard of reasonableness. This court cannot say that the state court's assessment here was contrary to, or an unreasonable application of, the *Strickland* standard." *Id.*

¶ 66    We previously observed that any issues that have previously been decided by a reviewing court are barred by *res judicata*. *Harris*, 224 Ill. 2d at 124-25. Since this court already held that trial counsel was not ineffective for failing to file a motion to suppression defendant's statement, his claim is barred under the doctrine of *res judicata*.

¶ 67    However, even if the claim were not barred, defendant cannot establish the requisite prejudice. Defendant attempts to avoid this bar by relying on Santana's affidavit alleging the police physically coerced his statement. According to defendant, Santana would have testified at the suppression hearing and at trial to support defendant's uncorroborated defense that his statement was involuntary. Defendant notes that his trial counsel had a transcript of Santana's grand jury testimony in which he recanted his statement and alleged physical coercion by the detectives. Santana's grand jury testimony was not included in defendant's successive petition. In a footnote, the petition stated,

30

"The Cook County Public Defender, petitioner's trial attorney, would not release any grand jury testimony to petitioner's counsel. However, a member from that office read Santana's grand jury testimony and confirmed that Santana recanted and said he was coerced into giving his statement. Post conviction counsel seeks leave to obtain his grand jury testimony to support petitioner's claims."

¶ 68    Absent the transcript of Santana's grand jury testimony, our review is based solely on Santana's affidavit. We already observed that Santana's affidavit did not name which police detectives engaged in his alleged abuse and declined to assume that Detective Garcia was involved. Further, Santana's handwritten statement was witnessed by Sergeant Walsh and ASA Gerhardt, not ASA Blakey. Santana also detailed different abuse than defendant has alleged, such that we concluded that the allegations were not sufficiently similar to establish a pattern and practice.

¶ 69    Further, Santana's statement did not implicate defendant in the shooting. Rather, Santana recounted Ocon telling him about the shooting the day after it occurred. The statement did not mention defendant. Since Santana's claims of physical coercion did not mention Detective Garcia and his statement did not discuss defendant, it was a reasonable trial strategy not to present this irrelevant testimony.

¶ 70    Generally, whether to call a particular witness is a matter of trial strategy, and an ineffective assistance of counsel claim arising from a matter of defense strategy will not support a claim of ineffective representation. *People v. Flores*, 128 Ill. 2d 66, 85-86 (1989). In our previous review of this claim, we concluded that defendant "cannot show that his trial counsel's decision to file a motion to quash arrest and suppress evidence rather than a motion to suppress evidence was not trial strategy." *Vidaurri II*, slip order at 12. We reach the same conclusion here.

Because Santana's interrogation and statement involved different police officers and ASA than defendant, trial counsel's decision not to call Santana as a witness in a suppression hearing and at trial does not show deficient performance nor how the result of the proceeding would have been different. Since defendant has not shown that his attorney was ineffective under either prong under *Strickland*, he has failed to establish the requisite prejudice under the cause and prejudice test. Accordingly, the trial court properly denied defendant's motion for leave to file his successive petition.

¶ 71    Finally, defendant argues that he satisfied the cause and prejudice test because the sentencing standards have changed for youthful offenders since his sentence was imposed. Based on these changes in case law, defendant asserts that since he was 19 years old at the time of the offenses, his *de facto* life sentence of 45 years violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The State maintains that defendant's sentence is constitutional and that he cannot establish the required cause and prejudice.

¶ 72    Defendant must satisfy both prongs of the cause and prejudice to proceed in filing his successive petition. *People v. Davis*, 2014 IL 115595, ¶ 14. We first consider whether defendant can establish the requisite cause.

¶ 73    "A defendant shows cause 'by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *Wrice*, 2012 IL 111860, ¶ 48 (quoting 725 ILCS 5/122-1(f) (West 2010)). In other words, to establish "cause" a defendant must articulate why he could not have discovered the claim earlier through the exercise of due diligence. *Wideman*, 2016 IL App (1st) 123092, ¶ 72. Here, defendant asserts the requisite cause has been satisfied because the evolving case law involving the sentencing of youthful offenders was not available at the time of his direct appeal or his prior postconviction

petition, which was filed before the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), and the subsequent case law which raised the possibility that youthful offenders could seek protection under *Miller*. See *Davis*, 2014 IL 115595, ¶ 42; *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 1, 23, 34; *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 1-2, 6; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶¶ 1-2.

¶ 74    The Illinois Supreme Court in *People v. Dorsey*, 2021 IL 123010, ¶ 74, found that "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." The supreme court reasoned that:

> "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing. Thus, *Miller*'s unavailability prior to 2012 at best deprived defendant of 'some helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id.* (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59).

¶ 75    In his reply brief, defendant contends *Dorsey* does not compel the conclusion that *Miller* cannot establish "cause" for youthful offenders to raise a proportionate penalties clause claim in a successive petition. However, the supreme court recently foreclosed defendant's contention. In *People v. Clark*, 2023 IL 127273, ¶ 93, the supreme court held that "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders." Rather, the defendant " 'had the essential legal tools to raise his present proposed claim under the proportionate-penalties clause' when he filed his previous postconviction petitions." *Id.* (quoting *People v. Haines*, 2021 IL App (4th) 190612, ¶ 49). Thus, the court concluded:

"citing the *Miller* line of cases does not satisfy the 'cause' prong of the cause-and-prejudice test for raising a proportionate penalties claim in a successive postconviction petition, as *Miller*'s unavailability does nothing to explain why defendant neglected to raise the proportionate penalties clause claim in his prior postconviction proceedings." *Id.* ¶ 94.

Since defendant cannot establish the requisite cause to file his successive postconviction petition, the trial court properly denied his motion for leave.

¶ 76    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 77    Affirmed.

*People v. Vidaurri*, **2023 IL App (1st) 200857**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 00-CR-8905(03); the Hon. Timothy J. Joyce, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, John E. Nowak, and Stacia Weber, Assistant State's Attorneys, of counsel), for the People. |