NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220701-U

NO. 4-22-0701

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 21, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| DEANDRE DANIELS, | ) | No. 12CF1193 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held:*    The appellate court affirmed the trial court's denial of defendant's
postconviction petition following an evidentiary hearing.

¶ 2        In November 2013, a jury found defendant, Deandre Daniels, guilty of attempt
(first degree murder) (720 ILCS 5/8-4, 9-1 (West 2012)), aggravated battery with a firearm (*id.*
§ 12-3.05(e)(1)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and unlawful possession
of a weapon by a felon (*id.* § 24-1.1(a)). The trial court sentenced defendant to 47 years in
prison. Defendant appealed his conviction and sentence, and this court affirmed. *People v.
Daniels*, 2016 IL App (4th) 140131, ¶ 2, 58 N.E.3d 902.

¶ 3        In June 2018, defendant filed an amended postconviction petition pursuant to the
Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(f) (West 2018)), arguing that (1) trial
counsel provided ineffective assistance by (a) failing to investigate and present an alibi defense
and (b) failing to impeach the testimony of Raymond Davis and (2) defendant was actually

innocent as shown by new affidavits from Jamell Jamison and Davis.

¶ 4    In March 2022, the trial court conducted a third-stage evidentiary hearing on defendant's petition. After receiving testimony from defendant's trial counsel and witnesses, the court denied defendant's petition.

¶ 5    Defendant appeals, arguing that the trial court erred by denying defendant's petition after a third-stage evidentiary hearing because (1) defendant's "claim of actual innocence was arguably meritorious" and (2) defendant made a substantial showing of ineffective assistance of counsel. We disagree and affirm.

¶ 6                                I. BACKGROUND

¶ 7    Because this case comes to us on a denial of defendant's postconviction petition at the third stage, we discuss only the facts relevant to that decision and those necessary to provide sufficient context. A more thorough discussion of the facts can be found in the opinion that resulted from defendant's direct appeal. *Daniels*, 2016 IL App (4th) 140131, ¶¶ 4-60.

¶ 8              A. The Charges Against Defendant and the Jury Trial

¶ 9    In November 2012, the State charged defendant with attempt (murder) (720 ILCS 5/8-4, 9-1 (West 2012)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges alleged that on November 5, 2012, defendant used a firearm to shoot Robert Jackson in the leg.

¶ 10    In November 2013, the trial court conducted defendant's jury trial.

¶ 11                              1. *The State's Evidence*

¶ 12                            a. Law Enforcement Testimony

¶ 13    Bloomington police officer Eric Riegelein testified that at approximately 4:16

p.m. on November 5, 2012, he responded to a call of a shooting on Orchard Road in Bloomington. When he arrived on the scene, he saw Marcus Winlow awake and lying on the ground. Michelle Brown, Winlow's mother, was holding a bloody cloth against a gunshot wound on Winlow's body. Robert Jackson was nearby, leaning on the front of a car, and he appeared to have been shot in the left thigh. Nobody at the scene informed Riegelein what had happened.

¶ 14        Detective Jared Roth of the Bloomington Police Department testified that he was the lead investigator in the Orchard Road shooting. During his investigation, Roth determined that the shooting arose from a rivalry between two rap groups—M.O.B. (which stood for "Money Over Bitches") and B.O.M. (which stood for "Blackout Mafia"). Roth stated that he received "extremely little cooperation" from the eyewitnesses.

¶ 15        Bloomington police officer Michael Luedtke testified that on November 5, 2012, he responded to a call on Orchard Road. He observed Winlow lying in the road next to a parked car and Jackson sitting on the hood of that car. Winlow had a wound to his abdomen. Jackson had a bullet wound on his left thigh. Jackson told Luedtke that "he was just standing there" and did not know who had shot him.

¶ 16        Luedtke testified further that he interviewed Brown, who approached him at the scene of the shooting and told him she saw a group of people shoot at Winlow and Jackson. She said she was walking out of her residence when she saw "a group of black males run up on Marcus and Robert." Brown said she saw "Pimp" (defendant), Jake Williams, Kenny King, "S Dot" (Qunshawn Gardner), and "Play" (Anton Smith) "run up on" Winlow and Jackson. Brown told Luedtke that she saw defendant shoot at Jackson five times with a black gun.

¶ 17                        b. Michelle Brown

¶ 18        Brown testified that she was Winlow's mother and she lived next door to him; she

resided at 1213 Orchard Road in Bloomington and Winlow resided at 1215 Orchard Road. Winlow used to make rap music and went by the nickname "Li'l Dude." She also identified defendant in open court and testified that he was known as "Pimp." Brown further stated that she was familiar with people nicknamed "Play," "Jake," "Thoon," "Mooch," and "Pimp." Brown was also familiar with Kaythiese Fitch, a friend of Winlow's, who went by the nickname "KK."

¶ 19      Brown testified that on the afternoon of November 5, 2012, she was at her residence when one of her other children came into the house screaming that Winlow had been shot. Brown ran outside and found Winlow lying on the ground outside her home with a gunshot wound in his back. Brown testified that she did not know who had shot her son.

¶ 20      The State confronted Brown with statements she made to the police immediately after the shooting and to the grand jury, including that she had been present for the shooting and had seen defendant shoot her son. She had also identified several other individuals who were with defendant when he shot Winlow. However, at trial, Brown denied that she had made those statements, testifying that she either did not recall making such statements or she had lied.

¶ 21      The State then introduced an affidavit written by Brown prior to trial, which stated that she wished to "remove [her] statement as the witness in this case." In the affidavit, Brown said that she did not see "Jake Williams, [defendant], Qunshawn Gardner, Anton Smith, Kenneth King, or Raymond Davis at the crime scene." She wanted all the charges to be dropped and stated that she would not testify at trial. She ended the affidavit by saying that she was not coerced into writing the affidavit; however, she also concluded by writing, "I would like all the gentlemen upon release to be ordered to attend several churches and give their testimonies while they thank God for a second chance in life."

¶ 22      The State also played for the jury a video-recorded interview of Brown conducted

by the police on November 5, 2012, just after the shooting had occurred. Brown told the police that prior to the shooting, she was walking on Orchard Road behind Winlow and Kaythiese Fitch, who both stopped to talk to Jackson. As the three were talking, a group of other men approached them. The other group included defendant, Williams, Gardner, King, Smith, and approximately four other people. Fitch and Smith began fighting. Williams pulled out a gun and shot Winlow one time. Williams then ran off. Fitch and Jackson ran toward a nearby "gangway." Defendant pulled out a gun and fired approximately four times in the direction Fitch and Jackson had run, shooting Jackson in the leg. However, Brown clarified that she did not actually see Jackson get shot. Gardner also had a gun and pointed it at Brown when she accidentally picked up Gardner's jacket. Brown stated further that Raymond Davis, who was also present, was carrying a gun and wearing dreadlocks.

¶ 23                              c. Robert Jackson

¶ 24        Jackson testified that he was shot in the left thigh on November 5, 2012. Jackson said that he was friends with Winlow and Fitch but was not familiar with B.O.M. or M.O.B. Neither he nor Winlow made rap music, but Fitch did. Jackson said he was walking by himself in a vacant lot on Orchard Road when he was shot. He did not see who shot him.

¶ 25                              d. Raymond Davis

¶ 26        Davis testified that on the afternoon of November 5, 2012, he was at King's apartment in the 1200 block of Orchard Road. Defendant was also there. Davis, King, and defendant made hip-hop music together in a group called "M.O.B., Members of Business," and they were making hip-hop music together that day at King's apartment.

¶ 27        While Davis was at King's apartment, Winlow and Fitch were there, and Davis got into a fistfight with Winlow. After the fight ended, Davis, King, and defendant walked over

to defendant's apartment and listened to music. Gardner and Smith joined them there. Davis testified further that after staying at defendant's apartment for approximately 10 or 15 minutes, the group decided to record music at a studio "off the highway" in Normal, Illinois.

¶ 28 Davis, defendant, King, and Gardner got in a van and drove back to King's apartment to retrieve King's phone before heading to the studio. As they walked from the van to King's apartment, a group of people ran up and attacked them. Davis stated that he was in the street near a big, grassy field. One of the attackers hit Davis in the face, but as he prepared to defend himself, he then heard gunshots and ran back to the van, along with King and Gardner. Defendant did not return to the van.

¶ 29 Davis testified further that on November 5, 2012, he had cheek-length dreadlocks.

¶ 30 2. *Defendant's Evidence*

¶ 31 Brandi Guzouskis testified that on November 5, 2012, she lived at 1214 Orchard Road. Guzouskis was at home that day when, at approximately 4:15 p.m., she heard "about five" gunshots. The balcony to Guzouskis's apartment overlooked the vacant lot on Orchard Road. After she heard gunshots, Guzouskis looked out her balcony door and saw several men walking east. She called 911 and told them that a black male with a white tank top, dark jeans, and dreadlocks had a gun. She then saw the same man shoot the gun two times while aiming toward the north. She saw two men on the ground.

¶ 32 Anthony Gibson testified that on November 5, 2012, he was working at Lube Pros just off of Orchard Road. At approximately 4:16 p.m., he heard between six and eight gunshots. Gibson thought he had heard kids playing with fireworks. The shots came in two waves: "a few gunshots, then there was a pause, and there was a pause and then there was a few more." Gibson did not see who fired the gunshots but saw people running.

¶ 33    Brittany Van Buren testified that she was defendant's girlfriend. She stated that on November 5, 2012, defendant had short hair and did not have dreadlocks. She said that defendant did not own a gun.

¶ 34    The jury found defendant guilty of all charges. As to the charge of attempt (murder), the jury also found that defendant personally discharged a firearm that proximately caused great bodily harm or permanent disfigurement to another person.

¶ 35    In January 2014, the trial court sentenced defendant to 47 years in prison. Defendant appealed, and this court affirmed. *Daniels,* 2016 IL App (4th) 140131, ¶ 105.

¶ 36                    B. The Postconviction Proceedings

¶ 37                              1. *The Petition*

¶ 38    In August 2017, defendant *pro se* filed a petition for postconviction relief pursuant to the Act. See 725 ILCS 5/122-1 (West 2016). In October 2017, the trial court advanced the petition to the second stage and appointed counsel.

¶ 39    In June 2018, defendant filed an amended postconviction petition, arguing that (1) trial counsel provided ineffective assistance by (a) failing to investigate and present an alibi defense and (b) failing to impeach the testimony of Raymond Davis and (2) defendant is actually innocent as shown by a new affidavit from Jamell Jamison and a recantation from Raymond Davis.

¶ 40                              2. *The Proceedings*

¶ 41    In July 2018, the State filed a motion to dismiss defendant's petition, which, in January 2019, the trial court granted. Defendant appealed and, in August 2020, this court reversed the court's dismissal of defendant's petition for postconviction relief with instructions to conduct a third-stage evidentiary hearing, concluding that based upon the Illinois Supreme

Court's then-recent decision in *People v. Robinson*, 2020 IL 123849, 181 N.E. 3d 37, defendant made a sufficient showing that he was entitled to a third-stage evidentiary hearing. *People v. Daniels*, 2020 IL App (4th) 190723-U, ¶ 64.

¶ 42        In March 2022, the trial court conducted an evidentiary hearing on defendant's postconviction petition. Although Maurice Sutton and Tylon McAllister had submitted affidavits that were attached to the petition, defendant did not call them to testify at the hearing. However, Davis and Jamison did testify on defendant's behalf.

¶ 43                            a. The Actual Innocence Claim

¶ 44                                i. *Jamell Jamison*

¶ 45        Jamell Jamison testified that he had a "vague recollection" of events that happened on the day of the shooting. He testified that he saw a group of people having an "altercation" outside on Orchard Road, "maybe it was a fight, scuffle, something like that." Jamison saw a tall black man with long hair armed with a weapon among the group. Jamison stated that defendant was not the man with the gun, nor was defendant even present for the altercation. Jamison said that he heard a gunshot and ran toward his family members' apartment, dropping his phone as he ran. He later contacted the police station in an attempt to locate his dropped phone but chose not to report what he had seen.

¶ 46        On cross-examination, Jamison testified that he had never personally met defendant but recognized him from pictures in the newspaper or from YouTube videos. When asked why he did not come forward with this information sooner, Jamison responded that he hoped the situation would work itself out and he did not want to be involved with the "courtroom." When asked why he then decided to sign an affidavit in 2018 (approximately five years posttrial), Jamison said, "I think my conscience just was heavy at that moment."

¶ 47        Jamison testified that he did not know that the rap groups M.O.B. and B.O.M. were going to meet outside on Orchard Road. The State then asked Jamison if he recalled writing in his 2018 affidavit that he knew the two groups were going to be meeting up that day to "squash their beef." Jamison said he did not remember. The State then impeached Jamison regarding his criminal record, which included receiving stolen goods in 2007, attempting to obstruct justice in 2008, obstructing justice and misuse of a credit card in 2009, obstructing identification in 2017, and attempted forgery in 2019. Jamison claimed that he did not remember the convictions from 2007 and 2009.

¶ 48                                 ii. *Raymond Davis*

¶ 49        Raymond Davis testified regarding what he had testified to at defendant's trial in 2013. Specifically, Davis acknowledged that he had previously testified that on November 5, 2012, he went to Kenny King's apartment to make music and, upon arriving, he saw Winlow and Kaythiese Fitch. Davis got into a fistfight with Winlow. After the fight, Davis went to defendant's apartment and listened to music. Ten or fifteen minutes later, Davis, defendant, King, Gardner, and Smith left the apartment to record music at the studio. The group got into a van and drove to King's apartment to retrieve King's phone. As the group walked from the van towards King's apartment building, a group of people attacked them. Davis was punched in the face, heard gunshots, and ran back to the van; defendant was not with them.

¶ 50        After acknowledging his previous testimony from 2013, Davis then testified that in 2017, he signed an affidavit recanting that testimony. Davis instead claimed that defendant did not go with the group to King's apartment and was not present at the shooting.

¶ 51        The State asked Davis several times why he originally testified that defendant was present at the shooting. Davis first said he was "under the distress like they was just asking a

bunch of questions and I was just saying yeah to them, like saying yes or no to them, and I ended up saying yes." Regarding the trial testimony, the State asked Davis whether he lied, and Davis said, "It wasn't really a lie; I just I wasn't really sure at that time." However, Davis did later acknowledge that he lied to detectives in an attempt to "use the defendant as an alibi." Davis said that at trial he told a public defender that defendant was not present.

¶ 52　　　　The State impeached Davis's credibility with his prior convictions for aggravated battery in 2012 and retail theft in 2011. The State asked Davis if he had any more convictions since the 2013 trial, and he answered, "like driving and stuff." The State reminded him of his 2017 conviction for obstructing justice.

¶ 53　　　　　　　　b. The Ineffective Assistance of Counsel Claim

¶ 54　　　　　　　　　　i. *Maurice Sutton*

¶ 55　　　　Maurice Sutton testified that on November 5, 2012, he was in defendant's apartment with Tylon McAllister, King, defendant, and "a few other people" Sutton acknowledged that they were in the rap group M.O.B. Sutton said that he and the other M.O.B. members were preparing to go to the studio to make rap music that day. They traveled to the studio in "a few cars." Sutton said that he rode in the same vehicle as McAllister and defendant, and everybody else rode in another car. However, before the entire group could go to the studio, King had to go get his phone because it had the raps they were going to record.

¶ 56　　　　Sutton testified that he, defendant, and McAllister waited at defendant's apartment while King and several other people went to King's apartment. During that time, defendant's girlfriend came home. Sutton said there was a spat between her and defendant about them packing to go out of town. Sutton claimed that defendant then told them to leave without him because he was going to stay and pack. Sutton said that he and McAllister then went directly

to the studio and waited for the others to call them, but nobody showed up. He claimed to find out later that "the situation had happened." Sutton said that he was never contacted, questioned, or approached by anyone about the incident, including by police or defendant's trial counsel. He remembered signing the affidavit in 2016.

¶ 57 The State impeached Sutton with his criminal record, including obstructing justice in 2007, aggravated battery in 2008, and residential burglary in 2009.

¶ 58 ii. *Tylon McAllister*

¶ 59 McAllister testified that on November 5, 2012, he was in defendant's apartment with defendant, King, Davis, Sutton, and defendant's cousin. They were planning to go to the recording studio later that day. McAllister testified that the group were members of M.O.B. McAllister testified that he drove himself and Sutton to the studio without defendant, who never left his apartment. McAllister claimed that defendant stayed home that day and did not leave with the others because he and his girlfriend had an argument about him staying to pack for a trip the next day instead of going to the studio. The other members left defendant's apartment in a van driven by defendant's cousin, Rodney Lane, and were supposed to meet up with them at the studio.

¶ 60 McAllister stated that he never spoke to police, the State, or defense counsel about any of those events. He testified that he respected defendant, who was like a mentor to him. The State impeached McAllister regarding his criminal record. When asked if he had any criminal convictions, McAllister replied, "traffic tickets, maybe." The State noted that he had been convicted of retail theft in 2011 and theft by deception in 2013.

¶ 61 iii. *Rodney Lane*

¶ 62 Lane said that on the morning of the shooting, he drove a van that belonged to a

girl he was seeing to defendant's house. Along the way, he picked up King, "something Dot," and "some Ski or something." Lane said that when they arrived, defendant was in his apartment waiting on his girlfriend to call. He testified that when he left defendant's apartment, several people asked to be dropped off at various places that he initially claimed not to recall. Lane claimed that that he dropped off King, "S Dot," and "that other guy, Ski or something," at Culver's.

¶ 63        Lane remembered talking to the police about the case. He recounted that he was with his girlfriend when the police knocked on his door. He answered the door and provided identification when requested. The police accused him of being "at a scene." Lane denied it and told the police, "[N]o, I just dropped somebody off." Lane claimed that the police threatened to take his girlfriend's van.

¶ 64        Lane said that he was subpoenaed for defendant's jury trial in 2013 and he traveled from Chicago to the McLean County courthouse, but after arriving, he was told by a "gentleman" that he was not needed. Lane left the courthouse without testifying at trial. He said that he was always willing to testify that defendant was not in the van when Lane left defendant's apartment. Lane also said that he did not see any shooting or fighting and did not know who was present on Orchard Road that day.

¶ 65                                iv. *John Prior*

¶ 66        John Prior testified as a State's witness that he worked as a private attorney and was appointed on February 21, 2013, to represent defendant at trial due to a conflict of interest with the public defender. During his testimony, Prior had with him the notes he had taken during his representation of defendant. Prior testified that in preparation for defendant's trial, he observed Jake Williams's trial, which stemmed from the same shooting incident, to determine

what evidence might be brought against defendant. Based on his observations, he believed that Michelle Brown (Winlow's mother) would become a key witness in defendant's case.

¶ 67    Prior testified that he and defendant discussed an alibi defense as early as February 27, 2013, days after being appointed trial counsel. Regarding the alibi defense, defendant told Prior that (1) he did not go to the shooting and (2) McAllister and Sutton could corroborate his story. Defendant provided contact information for McAllister but not Sutton.

¶ 68    Prior testified that he called McAllister but was not able to get hold of him. Prior surmised that he likely left a message. Based on the lack of notes for Sutton's contact information, Prior said that he did not think he ever received any contact information for him. Prior said that, according to his notes, after discussing the alibi defense with defendant, Prior obtained a private investigator to find McAllister. He said that by the time he obtained the investigator, he would not have needed to locate McAllister because he and defendant had already agreed to abandon the alibi defense. Prior believed the investigator was instead used to locate Guzouskis, who witnessed the shooting and called the police.

¶ 69    Prior determined that McAllister had a conviction for retail theft and Sutton had felony convictions for obstructing justice, destroying evidence, providing false information, and residential burglary. Prior considered McAllister's, and especially Sutton's, impeachability as a big concern for a successful alibi defense. Further, Prior did not believe that alibi defenses were considered good defenses by juries, citing a 2021 legal magazine article that discussed the risks of an alibi defense—namely, that it would be a fatal mistake for an alibi defense to depend upon witnesses who are not credible. Accordingly, Prior believed that raising the alibi defense in defendant's case would have been a fatal mistake. Instead, Prior decided that it would be better for the defense to keep the jury's focus on weaknesses in the State's case. Defendant agreed.

¶ 70          Prior also testified that he spoke with Van Buren, defendant's girlfriend, and "was able to talk to her about their trip to Florida and things like that." Van Buren was called to testify at trial to corroborate defendant's assertion that he did not have dreadlocks. Prior stated that "[t]he only thing that she did say that when she got home, and she got home about 4:30, that [defendant] was already there." Prior explained it was "kind of" good testimony for defendant because "the incident was reported at 4:16." However, the distance between the shooting location and defendant's apartment was a five-minute drive or a short jog or sprint. Because Van Buren was not with defendant at the time of the shooting and "the distance was too short," she was not used as an alibi witness.

¶ 71          Prior testified that he and defendant discussed his concerns about a potential alibi defense. First, Prior believed the alibi defense simply would not be very good based on the evidence. Second, Prior believed defendant was present at the shooting based on a conversation he had with defendant, during which defendant did not deny being at the shooting and gave a smirk or a smile that Prior interpreted as confirming defendant's presence at the shooting. Prior insisted to defendant that after looking at the evidence, he could not allow defendant to commit perjury at trial by testifying and would have had to withdraw as counsel. Further, Prior believed defendant's testifying would have been a bad idea considering his prior convictions for theft in 2005, manufacture/delivery of a narcotic in 2005, and driving while license revoked in 2012. Despite deciding not to pursue an alibi defense, Prior believed that Van Buren's testimony might get most of the relevant alibi defense information before the jury without the defense having to file its intention to raise an alibi defense.

¶ 72          Prior was asked why he did not impeach Davis at trial. Prior testified that before defendant's trial took place, Davis had received only 180 days in jail and 24 months of probation

for a Class X felony gun charge. Prior was concerned it would appear to the jury as if defendant was more likely the shooter based upon the more serious charges he faced. Prior asserted that it would have been more prejudicial than probative for defendant if Davis was impeached.

¶ 73 Prior also explained his tactical decision not to call Lane as a witness. Prior had difficulty finding Lane because defendant could not tell him where he was at or give him any contact information. Even if Lane was called as a witness, based on Prior's discussions with defendant, Lane's alibi testimony would have amounted to saying defendant was not at the shooting, which Prior believed would not be as strong of a case as focusing on the weaknesses in the State's case. Further, Prior also believed that Lane was not a key witness because there were multiple ways that defendant could have gone from his own apartment to the Orchard Road shooting location with or without Lane. Ultimately, Prior and defendant decided together not to pursue the alibi defense.

¶ 74 Instead of the alibi defense strategy, Prior elected to focus on impeaching Brown, an important witness to the State. Also, Prior believed that the likelihood of multiple shooters, including one with dreadlocks, plus cartridge cases that did not match the .45-caliber handgun recovered during the investigation of the shooting, could leave a factfinder wondering if the victims were shot by defendant or someone else.

¶ 75 On cross-examination, Prior described statements made by Stephen Shenkel, a jailhouse informant who, at the request of law enforcement, wore a wire to surreptitiously record a conversation with defendant. Shenkel recorded defendant (1) saying that he was in his apartment's bathroom when everybody else left and (2) lamenting that Prior explained that his decision not to call Shenkel as a witness was to avoid additional problems for the defense. Specifically, "Shenkel said that [defendant] had told him that they had threatened—it was

probably Michelle Brown—and she wasn't going to show up."

¶ 76                              c. The Trial Court's Decision

¶ 77        In July 2022, the trial court issued its written order (1) finding that defendant did not meet his burden to establish his claims of actual innocence or ineffective assistance of counsel and (2) denying his petition for postconviction relief.

¶ 78        The trial court wrote that it found Prior's testimony to be credible. The court also found that (1) Sutton's and McAllister's testimony would be merely conflicting with Brown's statement; (2) Jamison and Davis were subject to scrutiny and impeachment; (3) Lane did not provide a complete alibi; and (4) regardless of whether defendant had dreadlocks, the evidence presented was not inconsistent with there being more than one shooter. Further, the court stated that it was "not convinced there is a prejudice or a reasonable probability the result of the proceedings would have been different if an alibi defense was presented."

¶ 79        The trial court concluded its order, writing as follows:

"The Court has considered [defendant's] claims based upon the totality of the evidence. The jury heard the recorded eyewitness testimony of Michelle Brown that [defendant] shot Robert Jackson in the leg. The jury found that testimony convincing. The fact that witnesses now come forward with conflicting testimony and recant prior testimony does not convince the Court that it would probably change the result on retrial. Further, the Court does not believe trial counsel was ineffective as he pursued a sound trial strategy that [defendant] was not the shooter and the State could not prove [defendant] was the shooter based upon Michelle Brown's recorded statement. Brandy Guzovskis [*sic*] saw a shooter with dreadlocks and [defendant] did not have dreadlocks. Yet, this does not

eliminate [defendant] as the first shooter. Counsel researched and knew the potential pitfalls of presenting an alibi defense and made the sound trial strategy not to present such a defense. This Court believes [defendant] knew of counsel's trial strategy and acquiesced to the same. Unfortunately, for [defendant,] the jury found Michelle Brown's recorded statement convincing, and the Court believes the verdict was supported by the evidence. The Court finds [defendant] has failed to meet his burden to establish a claim of ineffective assistance of counsel. The Court further finds that [defendant] has failed to show actual innocence."

¶ 80    This appeal followed.

¶ 81                        II. ANALYSIS

¶ 82    Defendant appeals, arguing that the trial court erred by denying his petition after a third-stage evidentiary hearing because (1) defendant's "claim of actual innocence was arguably meritorious" and (2) defendant made a substantial showing of ineffective assistance of counsel. We disagree and affirm.

¶ 83                A. The Applicable Law and Standard of Review

¶ 84                            1. *The Act*

¶ 85    The Act provides a criminal defendant the means to redress substantial violations of his constitutional rights that occurred in his original trial or sentencing. *Robinson*, 2020 IL 123849, ¶ 42; 725 ILCS 5/122-1(a)(1) (West 2018). "A postconviction proceeding is not a substitute for a direct appeal, but rather is a collateral attack on a prior conviction and sentence." *People v. Davis*, 2014 IL 115595, ¶ 13, 6 N.E.3d 709.

¶ 86    Proceedings under the Act are divided into three stages. *People v. English*, 2013 IL 112890, ¶ 23, 987 N.E.2d 371. Relevant here, at a third-stage hearing, "the trial court acts as a

factfinder, making credibility determinations and weighing the evidence. *** Accordingly, we review the court's decision to deny relief for manifest error." *People v. Reed*, 2020 IL 124940, ¶ 51, 182 N.E.3d 64. "Manifest error is clearly evident, plain, and indisputable. *** Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98, 996 N.E.2d 617.

¶ 87                            2. *Actual Innocence*

¶ 88            "To succeed on a claim of actual innocence, a defendant must present [(1)] new, [(2)] material, noncumulative evidence [(3)] that is so conclusive it would probably change the result on retrial." *People v. Carter*, 2021 IL App (4th) 180581, ¶ 56, 188 N.E.3d 391. The trial court must consider whether that new evidence "undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. "[T]he new evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial." *Robinson*, 2020 IL 123849, ¶ 56. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97.

¶ 89                            3. *Ineffective Assistance*

¶ 90            All defendants enjoy the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant." *People v. Pope*, 2020 IL App (4th) 180773, ¶ 61, 157 N.E.3d 1055; *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

¶ 91            To establish deficient performance, a defendant must show his counsel's performance fell below an objective standard of reasonableness so that counsel's performance

undermined the proper functioning of the adversarial process to such an extent that the defendant was denied a fair trial. *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (citing *Strickland*, 466 U.S. at 687).

¶ 92    To show prejudice, a defendant must demonstrate "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767 (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 93                                    B. This Case

¶ 94    As an initial matter, defendant emphasizes several times in his brief that the trial court failed to make credibility findings regarding Jamison's and Davis's testimony. However, the absence of an explicit credibility finding is of zero consequence to this case. We reiterate what we wrote in *Carter*, 2021 IL App (4th) 180581, ¶ 77:

> "The trial court is not required to do anything more at a third-stage hearing than it is required to do when conducting a bench trial. The fundamental difference between the two is that at a third-stage hearing, the court is not called upon to assess guilt or innocence but instead to apply a specific test ***. In performing this task, the court is not required to make any explicit findings or discuss what evidence it found credible or not credible any more than it would be required to make such explicit findings to explain its decision after conducting a bench trial. (We are quick to add that many judges believe it a good practice to

- 19 -

provide such an explanation, and we do not dispute that. All we are saying is that such explanations are not legally *required*.)" (Emphasis in original.)

¶ 95 With that said, we thank the trial court for its carefully written order, in which the court concisely discussed (1) the evidence that it received at the third-stage evidentiary hearing and (2) the appropriate law. Further, we note that the court's order implicitly addressed the credibility of Jamison and Davis. For example, the court wrote that it did not dispute that defendant wore his hair short but (1) pointed out that Jamison's testimony regarding defendant's presence at the shooting was "directly contrary to evidence the State presented [and] Jamison *** was subject to impeachment"; (2) juxtaposed Jamison's testimony with that of the trial witnesses, concluding that it would not probably change the result on retrial; and (3) juxtaposed Davis's testimony with Brown's recorded testimony, highlighting the fact that Davis was recanting his prior testimony.

¶ 96                    1. *The Actual Innocence Claim*

¶ 97 First, defendant argues that the trial court erred by finding that his actual innocence claim failed because Jamison's and Davis's testimony that (1) defendant was not present at the shooting and (2) the shooter had long hair creates "a probability that the jury would have come to a different outcome." We disagree.

¶ 98 As the trial court pointed out in its written order, defendant's new evidence merely conflicts with the statement Brown gave in the immediate aftermath of the shooting, which the jury heard and clearly gave great weight. Further, the court explicitly found that Jamison and Davis were not credible, noting that Jamison's credibility was impeached by his prior convictions and Davis's testimony materially contradicted his trial testimony. Ultimately, the court weighed the credibility of the witnesses and determined that their testimony was not

- 20 -

conclusive such that it would probably change the result on retrial.

¶ 99 Because nothing in the record shows that defendant's claim of new evidence is so conclusive that it would probably change the result on retrial (*id.* ¶ 56), the trial court's denial of defendant's actual innocence claim was not against the manifest weight of the evidence.

¶ 100 2. *The Ineffective Assistance of Counsel Claim*

¶ 101 Defendant also argues that trial counsel was ineffective for failing to (1) investigate alibi witnesses and (2) impeach Davis's testimony. We disagree.

¶ 102 We note that "[a]ny time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court." *Id.* ¶ 68.

¶ 103 With that principle in mind, we thank the trial court for its credibility findings regarding Prior's testimony. Based on those findings and the record, we conclude that Prior's performance was not deficient.

¶ 104 As the trial court pointed out, Prior spent hundreds of hours on the case, kept defendant informed of his trial strategy not to pursue an alibi defense, and made a reasoned decision not to impeach Davis. To establish deficient performance, "[a] defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Davis*, 2023 IL App (1st) 220231, ¶ 29. Further, the fact that counsel's chosen trial strategy was ultimately unsuccessful does not establish that counsel's performance was deficient. *People v. Vidaurri*, 2023 IL App (1st) 200857, ¶ 62, 212 N.E.3d 615. Given Prior's reasonable and detailed explanations for his strategic decisions, we conclude that Prior's performance was not deficient. Accordingly, the court did not err by

denying defendant's ineffective assistance claim.

¶ 105                    III. CONCLUSION

¶ 106         For the reasons stated, we affirm the trial court's judgment.

¶ 107         Affirmed.